**Christine VAUGHN and Marion Gee, Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC CORP., International Brotherhood of Electrical Workers, AFL–CIO, Local 436, and International Brotherhood of Electrical Workers, Defendants.**

**Glenda CRUTCHER, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORP., Defendant.**

**Nos. LR–74–C–215, LR–76–C–196.**

United States District Court, E. D. Arkansas, W. D.

May 9, 1979.

Supplemental Opinion June 12, 1979.

Zimmery Crutcher, Jr., John W. Walker, Little Rock, Ark., for plaintiff.

James M. Moore, Little Rock, Ark., for Westinghouse.

John T. Lavey, Little Rock, Ark., for the unions.

## OPINION

ARNOLD, District Judge.

This is a suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, to redress alleged discrimination in employment on the ground of race. The two captioned cases have been consolidated. At a pretrial hearing, the motion of defendants to deny class certification was granted, and the case went to trial as three individual claims. Two of the plaintiffs, Marion Gee and Glenda Crutcher, are former employees of Westinghouse Electric Corporation. The other plaintiff, Christine Vaughn, is still employed by the defendant Westinghouse. The claims against the defendant labor organizations were settled before trial, and a consent decree has been entered embodying this settlement. The case was tried to the Court on April 24, 25, 26, 27, and 30, 1979. All parties have rested, and the case is now ready for decision.

■ Plaintiffs present a variety of claims of disparate treatment by their employer. The nature and order of proof in this kind of case are set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There, the Supreme Court held that the plaintiff must carry the initial burden of establishing a prima facie case of racial discrimination. In *McDonnell Douglas*, a failure-to-rehire case, the Court specified the following method of establishing such a case:

This may be done by showing (i) that he [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. (Footnote omitted.) 411 U.S. at 802, 93 S.Ct. at 1824. Here, no plaintiff claims that the employer discriminatorily failed to hire her. Each of these plaintiffs was at some point employed by Westinghouse. Instead, plaintiff Crutcher claims an unlawful discharge, and plaintiffs Vaughn and Gee claim that they were unlawfully disqualified from certain jobs they had been holding and made to take other, less desirable jobs. The Supreme Court has made clear that the *McDonnell Douglas* formulation should not be applied woodenly to every situation. "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 801 n.13, 93 S.Ct. at 1824. In the present situation, the *McDonnell Douglas* test, *mutatis mutandis,* requires plaintiffs, in order to establish a prima facie case of racial discrimination, to show that they belong to a racial minority, that they were employed by the defendant in a certain capacity, having been initially found to be qualified in that capacity, that they were discharged or disqualified from their jobs, and that following their discharge or disqualification defendant continued to seek and employ persons for the jobs in question. In addition, they have the burden of showing, either by statistical evidence or by testimony of specific racially motivated incidents, that there is probable cause to believe that their discharge or disqualification was motivated in substantial part by race.

■ This Court finds that the proof is more than sufficient to establish a prima facie case. Title VII of the Civil Rights Act of 1964 became effective on July 2, 1965.

At that time almost no blacks were employed by the defendant Westinghouse. There was one black white-collar employee, a secretary. No blacks were in supervisory positions and only one black had been hired (in 1963) as a production employee. The situation has changed rather slowly. Out of 22 office and clerical employees, only three are black at the present time, none of them in a supervisory position. No black person has ever been employed as a supervisor in the defendant's office force at its Lamp Operations Division plant in Little Rock, the plant involved in this case. Out of 25 or 26 supervisors, including manufacturing supervisors, who hold the entry-level management jobs, only two are now black. One of these has been a supervisor only a year or a year and a half. There is no regular program for allowing production employees to rise to supervisory ranks. When supervisory positions become open, this fact is not systematically publicized, and these jobs are not posted. The only jobs posted are production or "bargaining unit" jobs. The defendant's overall work force is roughly representative of the proportion of blacks and whites in the relevant population, but black employees are heavily, indeed almost exclusively, concentrated in production jobs, which are lower paying. In addition, many more black people than white people apply for jobs at Westinghouse. The following statistical table is illuminating:

| Year | Black Applicants | Black Persons Hired | White Applicants | White Persons Hired |
|------|------------------|---------------------|------------------|---------------------|
| 1970 | 175 | 56 | 303 | 118 |
| 1971 | 341 | 17 | 434 | 78 |
| 1972 | 1902 | 96 | 1124 | 149 |
| 1973 | 2209 | 90 | 1104 | 212 |

■ W. T. Hunnicutt, Personnel Manager for the Little Rock plant, testified that he did not know how to explain these figures, and the Court must agree. The inference is very strong indeed that the number of black people hired is being artificially depressed. No particular qualifications are required for production-level jobs at this plant. There is no reason whatever to suppose, to take 1972 as an example, that 149

whites out of 1124 would be qualified, while only 96 blacks out of 1902, a much larger applicant pool, could make the grade. If objective criteria had been or could be prescribed for these jobs, the situation would be different, but apparently persons are hired simply because the employer wants them. Up until 1965 substantially all the employees were white, and perhaps the employer believes that harmony in its work force can best be preserved by not allowing the number of black employees to exceed by much their proportion in the general population, about 18 or 20%. This motivation is forbidden by law. The law requires not that black people be employed proportionately, but that each applicant, regardless of race, receive equal opportunity. The Supreme Court's pronouncement in *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957, 969 (1978), is unmistakable:

> It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the workforce. (Emphasis in original.)

In addition, on February 1, 1974, an organizational chart of management positions at the Little Rock plant only listed one black person out of 31. This organizational lineup is still basically the same, except that there are now two blacks out of 31. Both of these employees, however, are first-line manufacturing supervisors, or foremen. The same sort of statistical proof is apparent in hiring figures for maintenance jobs. In 1970, no blacks were hired out of 15. In 1973, no blacks were hired out of 31. And in the years 1970 through 1974, only seven blacks were hired out of 93. Between 1972 and 1978, a total of 65 persons were discharged, 39 of whom were black, a figure far above the overall proportion of black employees, which now is at a high of about 24 or 25%. Possibly this over-representation of blacks in the discharge population is simply a result of chance, and the Court is not holding that any of these particular discharges was illegal. The discharge fig-

ures, however, simply add to the impression that there cannot be so much smoke without at least some fire. With the exception of some maintenance jobs, moreover, no specific qualifications have been set out by the employer either for production-line jobs, as noted above, or for supervisory jobs. Subjective criteria for employment are not illegal in themselves, but the fact that an employer has continued to use them, with the danger of disparate treatment that they entail, is a factor to be considered.

The evidence making a prima facie case goes beyond statistics. Laying to one side for the time being the testimony of the parties themselves, the Court was especially impressed by the evidence given by Wilma Donley, a former employee. Ms. Donley was employed at Westinghouse from August 31, 1972, through August 28, 1978. She was a bright and diligent worker, though she had some difficulties with absenteeism and lateness. From February 1973 to December 1974 she was a shop steward for the union, International Brotherhood of Electrical Workers, AFL–CIO, Local 1136. In this capacity she witnessed harassment by supervisors of several black employees. She prepared and processed grievances for them. There was a good deal of conflict between foremen and black employees, including bickering and weeping. After January 9, 1975, when Ms. Donley's twins were born, she was no longer formally a shop steward, but she did continue in an informal capacity to help employees who felt aggrieved, all of whom were black. Ms. Donley observed black employees being given work that rightfully belonged to others, and white employees being permitted to loaf in the bathroom. Substantially more grievances originated with black employees than with whites, and on one occasion Ms. Donley took a group of black employees to an attorney to complain. None of these employees is still with the company. It is not claimed, and the Court does not find, that any of these persons was discharged for consulting an attorney. The visit to the lawyer, and the fact that none of these persons is still at Westinghouse,

are simply two more bits of the mosaic that the Court must piece together. Ms. Donley continued to be a spokesman for black employees and was treated as such by foremen. She was finally discharged in 1978 after being absent for reasons of health for some time. Ms. Donley is not a party and did not specifically claim on the witness stand that her discharge was retaliatory in nature, so it is unnecessary for the Court to comment on that question.

Ms. Donley's testimony was wide-ranging, and the above is simply a general summary. Much of what she said was contradicted by company witnesses, but in view of her record as a competent worker and of the absence of any substantial motive for falsification, this Court specifically credits Ms. Donley's testimony. On the basis of this evidence, together with the statistics recounted above, the Court holds that the plaintiffs have made out a prima facie case of racial discrimination.

■ Under *McDonnell Douglas*, the burden then shifts to the defendant to show that the personnel actions taken were based upon some legitimate, nondiscriminatory reason. This issue of course implicates the defendant's personnel actions with respect to the individual plaintiffs, and each of the plaintiffs will be discussed in turn.

### 1. Glenda Crutcher.

Ms. Crutcher was employed on May 1, 1972, as a sealex machine operator, labor grade 4, on the second shift at the rate of $2.48 per hour. She was "hired in" by supervisor C. T. Turnage, but was almost immediately transferred to supervisor Roger Maynard. On June 4, 1973, Ms. Crutcher transferred at her request to the labor grade 3 job of mount inspector-coil feeder at the rate of $2.92 per hour. On May 27, 1974, she was transferred as a result of a reduction in force to the labor grade 1 job of flimsic paster at the rate of $3.06 per hour. Her supervisor then became Carl Menyhart. On September 9, 1974, she transferred at her request to the labor grade 1 job of repacker at the rate of $3.22 per hour. On January 16, 1975, she was trans-

ferred as a result of a reduction in force to the labor grade 3 job of mount inspector-coil feeder at the rate of $3.68 per hour. Her supervisor became James Birch. On September 22, 1975, she transferred at her request to the labor grade 1 job of getter application operator on the first shift at the rate of $3.52 per hour. Her supervisor became D. J. Batholomew.

On October 3, 1975, Ms. Crutcher was given a three-day disciplinary suspension. The reasons stated were insubordination and belligerence towards her supervisor. She was given a written warning that future offenses would result in termination. On November 19, 1975 she was terminated, and the reasons given were continued insubordination and use of abusive language.

■ Ms. Crutcher's specific claims were that she was refused adequate training or help when temporarily transferred to the job of bulb washer, that she was verbally abused and harassed by her supervisors, that she was given a disciplinary suspension for three days, and that she was terminated, all on account of her race and without just cause. Taking into account both Ms. Crutcher's testimony and that of her supervisor's, but relying especially on the copious documentary evidence supplied by the defendant, see *International Bh'd of Teamsters v. United States*, 431 U.S. 324, 360 n. 45, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), this Court is persuaded that the defendant has met its burden with respect to each of these issues. Ms. Crutcher was in fact given sufficient training, though most of the training came not from the supervisors personally, but instead from other employees assigned for the purpose. Whether training is done by the supervisor or by another employee, and whether the employee giving the training is white or black, are both immaterial. The fact is that training was given, and there is no occasion to determine whether any lack of training might have been due to the employee's race.

The job of bulb washer, which Ms. Crutcher was temporarily assigned to perform, apparently was a particular bone of

contention. Her regular job at the time was getter applicator, also referred to by the parties as getter girl. "Getter" is a liquid applied to light-bulb filaments to prevent them from burning too quickly or unevenly. It frequently occurred in the course of the production process that there was no more need for getter to be applied, and when Ms. Crutcher assumed the position of getter applicator this fact was carefully explained to her. She was told at the time that it would be necessary to assign her temporarily to certain other jobs, including that of bulb washer. The Court visited the Westinghouse plant and observed in particular the bulb-washing machine. The machine consists essentially of a series of racks, each of them capable of holding four bulbs. The machine moves at eight-second intervals, during each of which one employee, standing on one side of the machine, must place into the rack four bulbs. Another employee, standing on the other side of the machine, removes the bulbs from the rack after they have passed through a washer. The Court stood and observed this machine for some time. On the occasion of the Court's visit the machine was moving at exactly the same speed as in 1975, when the conflict arose between Ms. Crutcher and her employer. The job is of no particular difficulty and should have required little, if any, training. It does require some manual dexterity and attention, as well as diligence in circumstances that must inevitably be tedious, but the job can in no way be described as complex or exacting. (As a matter of fact, Ms. Donley testified that none of the jobs at the plant was difficult, and that all of them could be properly performed if a person diligently applied herself.) The Court believes that Ms. Crutcher was capable of performing this job and failed to do so because she did not like it.

Various altercations between Ms. Crutcher and some of her supervisors ensued. The testimony as to who said what to whom is sharply conflicting. The matter began to come to a head after Ms. Crutcher became a getter applicator under supervisor D. J. Bartholomew. As noted above, part of her duties was to work on the bulb-washer when there was no need to be applying any getter. On September 29, 1975, Ms. Crutcher went reluctantly to the job. Her performance did not improve. She told Mr. Bartholomew it would not improve because bulb-washing was not her regular job. On September 30, 1975, she told Mr. Bartholomew that the getter job was hers and that bulb-washing was not. She threw her gloves against the window and refused to clock out when instructed to do so. Mr. Bartholomew recommended that she be discharged, but the matter was resolved with a three-day disciplinary suspension, including a written warning that the next offense would result in termination. On November 3, 1975, Mr. Bartholomew saw Ms. Crutcher at her post reading a book. It was a violation of posted company rules to have personal reading matter in the plant. Upon being admonished, Ms. Crutcher replied in obscene terms. She also told him that his only duty was to see that she got her paycheck. She referred to Mr. Bartholomew and to Richard Thompson, his superior, with a racial epithet. On November 19, 1975, she was discharged.

The Court finds that this discharge was legitimate and nondiscriminatory. Ms. Crutcher's supervisors did not abuse or harass her verbally—quite the contrary. The company legitimately felt that her work and attitude were unsatisfactory. The fact that the company may have discriminated generally is not an automatic shield for every black employee who claims unfair treatment. An employee still owes his employer a day's work for a day's pay, and it is the duty of the employee to follow proper instructions. This Ms. Crutcher failed to do. Under *McDonnell Douglas* she could still prevail by showing that the reasons given for her discharge were merely pretextual, a cloak for racial motivation. There is no persuasive evidence in this record to that effect.

2. *Marion Gee.*

Plaintiff Marion Gee was hired by Westinghouse on June 8, 1970, in the labor grade

4 job of sealex machine operator at the rate of $2.20 per hour. On October 19, 1970, she was disqualified as a sealex operator and placed on the open labor grade 1 job of bulb-loader-hand at the rate of $2.55 per hour. On November 1, 1971, she changed from second to third shift at the request of the company and was then making $2.45 per hour. On January 22, 1973, she transferred at her request to the labor grade 3 job of mount inspector-coil feeder on the second shift at the rate of $2.76 per hour. On April 2, 1973, employee Gee was disqualified as a mount inspector-coil feeder and returned to her former job of bulb-loader-hand at her former rate of $2.76 per hour. On February 11, 1974, employee Gee transferred at her request to the labor grade 3 job of packaging operator-sleeving at the rate of $3.06 per hour. She remained in this job on the second shift until the date of her termination on February 14, 1975, for possession of a loaded firearm on company premises in violation of company rules. At the time of her termination, she was paid at the rate of $3.52 per hour.

■ Ms. Gee does not contest the legality of her termination. She does claim that she was disqualified from certain jobs, and verbally abused and harassed by supervisors, on account of race. The two disqualifications at issue occurred on October 19, 1970 (sealex operator), and on April 2, 1973 (mount inspector-coil feeder).

Roger Maynard was the supervisor who disqualified Ms. Gee on both occasions. She was a sealex operator under his supervisor for about a month in 1970. He testified that her work was characterized by too much "shrinkage," that is, waste caused by burned wires. After a month on the job, according to Mr. Maynard, shrinkage should be between 15 and 25 wires per shift, but Ms. Gee went as high as 300 or 400 wires. He discussed the problem with her and gave her a considerable amount of his own time to attempt to train her better, but to no avail.

On January 16, 1973, Ms. Gee returned to Mr. Maynard's supervision, this time as a mount inspector-coil feeder. Mr. Maynard made thorough contemporaneous notes on Ms. Gee's performance. He gave her special instruction on how to start the machine, to which she did not respond. A number of other operators were assigned to work with her, and each of them said that she wasn't catching on. On January 30, 1973, she unexpectedly started up her machine while a maintenance man had both of his arms inside it. A major accident was avoided only by luck. On another occasion, she laid her glasses down inside her machine while it was running and jammed it. Mr. Maynard assigned Linda Krebs, a coworker, to assist Ms. Gee for ten working days. She improved considerably, but not enough in his judgment. On March 20, 1973, Mr. Maynard warned Ms. Gee that she would be disqualified within ten days if her work did not substantially improve. On March 26, 1973, Mr. Maynard observed Ms. Gee's work station "in a mess." In addition, her log of coils was almost illegible. On April 2, 1973, Ms. Gee was disqualified. According to Mr. Maynard, she made a sincere effort but was unable to do the job, primarily because her hands and fingers were too large to deal with the delicate work required.

The Court is persuaded that Mr. Maynard's actions were not based on any racial motivation. He made a good-faith judgment about Ms. Gee's ability to perform two particular jobs. There is no persuasive evidence that these stated reasons were merely pretextual. When Ms. Gee was replaced (and this is true of all of the employees involved here), her position was filled on a strict seniority basis, a system that is not illegal in and of itself. *International Bh'd of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Nor was Ms. Gee verbally abused or harassed, for racial reasons or otherwise. Her supervisor did speak with her a number of times in an effort to encourage better performance, but these visits were reasonable and required by the supervisor's own responsibilities.

### 3. *Christine Vaughn.*

The plaintiff Vaughn was hired by Westinghouse on July 13, 1970, as a sealex ma-

chine operator, labor grade 4, at the wage rate of $2.20 per hour. On or about November 16, 1970, she was transferred to supervisor Oscar Brazil's section as a sealex machine operator and was then earning $2.54 per hour. On January 25, 1971, she was changed from second to third shift due to a reduction in force and continued working as a sealex operator receiving a general wage increase which raised her rate of pay to $2.69 per hour.

On April 19, 1971, supervisor C. T. Turnage disqualified Ms. Vaughn as a sealex operator. She was placed on an open labor grade 1 job of bulb-loader-hand earning $2.45 per hour. On November 6, 1972, Ms. Vaughn transferred at her request from second to third shift and was then making $2.76 per hour as a bulb-loader. On January 29, 1973, she transferred again at her request to the job of packaging operator-sleeving, a labor grade 3 job, with the same rate of $2.76 per hour. On March 28, 1977, she changed from packing operator-sleeving to utility operator-simplex incandescent group (SIG) with the rate of pay of $4.46 per hour.

On April 19, 1977, Ms. Vaughn became disabled, but she returned to work on June 13, 1977, as a utility operator earning $4.71 per hour. On January 1, 1979, she was transferred as a result of a reduction in force back to the job of packaging operator-sleeving at the rate of $5.40 per hour. She has continued in this job until the present time.

Ms. Vaughn claims that she was disqualified from the sealex job, declared surplus from other jobs, denied promotional opportunities, issued a written warning for being repeatedly late to work, and verbally abused and harassed by her supervisors, all on account of race. With the exception of her disqualification as a sealex operator, all of Ms. Vaughn's changes in jobs were occasioned either by her own request or by a bona fide reduction in force, having the result under Westinghouse's legal seniority system of "bumping" her to another job. In addition, there were attendance problems with Ms. Vaughn which are amply documented in the company's records. There is no evidence that she was verbally abuse or harassed, on account of race or for any other reason. With respect to these claims, the Court holds that the defendant has borne its burden.

The result is otherwise, however, with regard to Ms. Vaughn's claim that she was disqualified as a sealex operator on account of her race. The Court has carefully considered the testimony of defendant's witnesses on this point and has studied each of the exhibits offered with respect to Ms. Vaughn's work record as a sealex machine operator. As noted above, on January 25, 1971, she was transferred from second to third shift because of a reduction in force. She had been a sealex operator on second shift under O. D. Brazil, and transferred to the same job on third shift under C. T. Turnage. Mr. Brazil's employee evaluation form with regard to Ms. Vaughn, dated January 20, 1971, states that her quality and quantity of work were poor and that she could not make production. Mr. Brazil also stated that he would not rehire Ms. Vaughn. On the other hand, she got along well with others, and Mr. Brazil had no supervisory problems with her. Most important of all, a form dated January 18, 1971, signed by both Ms. Vaughn and Mr. Brazil, stated that she had had "previous satisfactory experience" as a sealex machine operator on the second shift. The Court must conclude that, although Mr. Brazil had some problems with her, he did not consider them serious enough to label her work "unsatisfactory." She then began work under Mr. Turnage's jurisdiction. On March 9, 23, 24, and 30, and on April 15, 1971, Mr. Turnage warned Ms. Vaughn about production problems, including what he believed to be too many burned wires. Finally, on April 19, 1971, Mr. Turnage disqualified her, stating that although she got along well with others, he had been unable to motivate her, and believed she had no interest in the job of sealex machine operator. Her disqualification form stated that she would not be eligible to hold this job in the future.

The Court is not persuaded that the defendant has borne its burden of proving

that this disqualification was not motivated in substantial part by racial reasons. Racial motivation is often difficult to isolate. In the nature of things, it will rarely appear on the surface, or at any rate has rarely done so in recent years. The Supreme Court has warned that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion. *International Bh'd of Teamsters v. United States, supra,* 431 U.S. at 343 n. 24, 97 S.Ct. 1843; *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The prima facie case made here did not relate specifically to disqualifications of employees, but the evidence recounted above is sufficient to show that Westinghouse maintained a stratified job environment. The more desirable jobs, for whatever reason, were held by white people, in general. The resulting pervasive atmosphere makes it incumbent upon Westinghouse, if it is to prevail, to show that the proof on its side is preponderant. The quality of proof with respect to Ms. Vaughn falls short, in this Court's opinion, of that offered with respect to the other two individual defendants. She was never a discipline problem and was always cooperative. She had difficulty with absenteeism, but not so great as to warrant dismissal. She has served in a variety of capacities, including a utility operator, an employee who must operate a number of different machines in quick succession. In addition, Ms. Vaughn received increases in pay while she was a sealex machine operator and, in fact, was being paid the top rate at the time of her disqualification. A "bump sheet," representing the state of the company's records as of January 1, 1979, indicates that she had previously performed the sealex machine operator's job satisfactorily. She unquestionably had problems with production, but the absence of objective production criteria makes it difficult for the Court to hold that these problems were serious enough to meet the burden imposed on the defendant by law. Apparently defendant's supervisors had numerical standards to judge performance, but these standards were not communicated to the employees and were not re-

vealed to the Court in testimony. Furthermore, employees are not given any chance to re-qualify for a certain job after they have been disqualified. There was testimony that an employee with relevant experience could try out for such a job again, but how could Ms. Vaughn have obtained this experience? The only way to obtain experience operating a sealex machine is to operate the machine, and this is the very opportunity that was denied her by the defendant.

In short, this is a case where the *McDonnell Douglas* rules as to burden of proof are dispositive. Defendant's position is by no means without support, but it has simply failed to persuade this Court that its proof is sufficient to overcome plaintiff's prima facie case with respect to Ms. Vaughn's disqualification.

These findings of fact and conclusions of law dispose of the liability issues in this case. The question of relief remains. The Court would like submissions from the parties covering the following questions, together with any other issue the parties believed should be addressed: (1) Should Ms. Vaughn be immediately reinstated as a sealex machine operator, or should she simply be declared eligible to bid, under the company's seniority system, on the next job opening in that category? (2) If Ms. Vaughn is reinstated as a sealex machine operator, should the company be required to institute objective performance criteria by which her fitness to retain the job can be assessed? (3) What amount of money will compensate Ms. Vaughn for the difference in pay she has actually received, and the pay she would have received had she not been disqualified as a sealex operator in 1971? (4) What prospective equitable relief should the Court order?

Plaintiffs should file their memorandum on or before May 20, 1979, and defendant should reply on or before June 1, 1979.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO RELIEF

The Court has before it plaintiffs' Memorandum in Support of the Court's Findings

as to Relief, filed May 18, 1979, and defendants' Response to Relief Requested on Behalf of Plaintiff Vaughn, filed June 1, 1979. These memoranda concern the question of what relief should be included in this Court's final judgment.

█ The Court is not persuaded that Ms. Vaughn, the prevailing plaintiff, should be immediately reinstated as a sealex machine operator. She should and will be declared immediately eligible to bid on the next available sealex job, but to order her immediate reinstatement would violate the lawful seniority system included in the governing collective-bargaining agreement. It would also displace some innocent employees who are not parties to this case and have had no notice that their rights or status might be affected. Ms. Vaughn will therefore be declared immediately eligible to bid on the next available sealex job. When such a job does become available, her bid will be evaluated according to the seniority system, which has been uniformly and lawfully applied.

█ There is something to be said for objective performance criteria, and the defendant could perhaps avoid some legal difficulties in the future if it adopted such criteria for evaluation of employees. This Court, however, is not going to impose such an obligation as part of its judgment. The Court has neither the inclination nor the talent to involve itself in management decisions of this nature. Such objective statistical criteria for job performance, though they no doubt could be devised, would inevitably present difficult questions of application to individual cases, unless they are to be mechanically applied in every instance, without regard to the circumstances of individual employees. The Court is not persuaded that the imposition of such a requirement is necessary to vindicate the statute.

█ Ms. Vaughn should receive backpay in the amount of $1,696.25, the total difference in her pay between April 19, 1971, the date of her unlawful disqualification, and May 30, 1979. Defendant argues that she failed in her duty to mitigate damages, but the Court does not agree. It is true that Ms. Vaughn could have bid on another labor grade four job six months after her disqualification as a sealex machine operator. It is also true that she stated in 1976 that there were no particular higher-paying jobs at the plant for which she would like to be trained. In addition, on January 1, 1979, Ms. Vaughn was shown a company record that appeared to list her as a qualified sealex machine operator, but took no steps to bid on such a position after seeing this record.

None of these events cuts off her entitlement to backpay. She was unlawfully disqualified as a sealex machine operator, a job that she wanted, and she did not become again qualified for this position until this Court's ruling. The January 1, 1979, company record is said by the company to be a mistake, and if Ms. Vaughn had attempted to use it in bidding for a sealex machine operator's job, she would undoubtedly have been met with this reply. If the company had come to her and told her unequivocally that she was eligible to bid on a sealex machine operator's position, and if she had then declined to bid, the defendant would have a point, but that is not what happened. The judgment will therefore contain an award in Ms. Vaughn's favor of $1,696.25, as noted above. In addition, backpay will continue to run in her favor until she is given an opportunity to bid on a sealex machine operator's job and is awarded the job, this relief being necessary to make her whole.

█ The judgment will also contain an injunction forbidding the defendant from discriminating against any employees in respect of pay, conditions of employment, criteria for demotion, promotion, or disqualification, and the like, on the basis of race. The finding of violation in Ms. Vaughn's favor is an ample basis for such an injunction, especially in view of the prima facie case of plant-wide discriminatory practice set forth in this Court's opinion filed May 10, 1979.

Judgment is being entered in accordance with this opinion.

## JUDGMENT

This case having come on for trial to the Court on April 24, 25, 26, 27, and 30, 1979; all parties having rested; this Court having filed its opinion dated May 10, 1979, containing findings of fact and conclusions of law; the defendants' motion under Fed.R. Civ.P. 59(a)(2) for amended findings of fact and conclusions of law having been denied by order dated May 23, 1979; this Court having made its supplemental findings of fact and conclusions of law with respect to relief in an opinion dated June 12th, 1979; and the Court being well and sufficiently advised in the premises,

It is by the Court this 12th day of June, 1979, CONSIDERED, ORDERED, ADJUDGED, and DECREED:

1. That the complaints of Marion Gee and Glenda Crutcher be, and they are hereby, dismissed with prejudice.

2. That the plaintiff Christine Vaughn have and recover of and from the defendant Westinghouse Electric Corporation judgment in the amount of $1,696.25, representing backpay to and including May 30, 1979.

3. That the defendant Westinghouse Electric Corporation be, and it is hereby, ordered and directed to permit the plaintiff Vaughn to bid on the next available sealex machine operator's job under the terms of its collective-bargaining agreement, her bid to be evaluated on the basis of defendant's lawful seniority system.

4. That plaintiff Vaughn have and recover judgment of and from the defendant Westinghouse Electric Corporation in whatever additional amount may be appropriate to make her whole for losses incurred between June 1, 1979, and the date she receives a sealex machine operator's job, this amount to be computed in accordance with submissions of the parties to be made at the appropriate time.

5. That the defendant Westinghouse Electric Corporation, its agents, servants, and employees, be, and they are hereby enjoined and restrained from failing or refusing to hire, from discharging, and from otherwise discriminating against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, including promotion, demotion, and disqualification from particular jobs, because of such individual's race or color.

6. That in addition to the monetary award made herein, plaintiff have and recover judgment of and from the defendant Westinghouse Electric Corporation in the amount of her costs expended in this action, all monetary awards to bear interest at the rate of ten per centum per annum from and after the date of the entry of this judgment (except the award to be computed in the future under paragraph 4 of this judgment), but with no addition for pre-judgment interest, since the amount of defendant's liability could not be reasonably ascertained until this Court had ruled.

For all of which, let execution issue, at the time and in the manner provided by law.