Kareem Dawud FARRAKHAN, Plaintiff,

v.

SEARS, ROEBUCK & CO., Defendant.

Civ. No. 78-0-329.

United States District Court,
D. Nebraska.

Dec. 19, 1980.

Thomas F. Hoarty, Jr., Omaha, Neb., for plaintiff.

Frank H. Kulig, Omaha, Neb., for defendant.

## MEMORANDUM

DENNEY, District Judge.

This is an employment discrimination case brought under 42 U.S.C. § 2000e and 42 U.S.C. § 1981. The plaintiff alleges that the defendant discriminated against him because of his race. A nonjury trial[1] was held and the following discussion constitutes the Court's findings of fact and conclusions of law.

### I.

The central focus of inquiry in an employment discrimination case is "whether the employer [was] treating 'some people less favorably than others because of their race.'" Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The order of proof in such cases is well established.

> First, the plaintiff must show the existence of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" Furnco Const. Co. v. Waters, supra, 438 U.S. at 576 [98 S.Ct. at 2949], citing Teamsters v. United States, 431

---

1. The plaintiff was represented throughout this case by a Court appointed attorney, Thomas Hoarty. In civil rights cases, Court appointed attorneys must serve without any assurance of receiving *any* compensation for their efforts. Despite this fact, Mr. Hoarty has vigorously represented the plaintiff at all stages of this litigation and has surely incurred considerable expense. The Court wishes to acknowledge the exemplary performance of Mr. Hoarty, and to express its appreciation for his efforts.

U.S. 324, 358 [97 S.Ct. 1848, 1866, 52 L.Ed.2d 396] (1977).[2] Once a plaintiff establishes this prima facie case, the burden shifts to the employer to rebut the adverse inference by articulating "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. [792], 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). But even if the employer meets this burden, the complaining party is given the opportunity to show that the proffered evidence is merely a pretext for discrimination. *Id.* at 804–05 [93 S.Ct. at 1825]. *See generally Kirby v. Colony Furniture Co., supra.* *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir. 1980). It is important to note that regardless of the manner of proof the plaintiff always bears the burden of persuading the trier of fact that the defendant's actions were racially motivated. *Sweeney v. Board of Trustees*, 604 F.2d 106, 108 (1st Cir. 1979).

The plaintiff has attempted to prove that the defendant's treatment of the plaintiff in a variety of matters was motivated by consideration of the plaintiff's race. Each of these incidents will be considered separately. For the reasons discussed below, the Court is of the opinion that the plaintiff has failed to prove by a preponderance of the evidence that the defendant's actions were racially motivated.

## II.

■ The plaintiff contends that the defendant's refusal to enroll him in Sears' Retail Management Development Program [RMDP] was premised on consideration of the plaintiff's race. In order to assess this claim, the Court must review the circumstances surrounding the defendant's hiring decision. Since it is clear that the defendant's decision was based on the plaintiff's

relative lack of qualification, the Court finds that the plaintiff has failed to prove his claim of racial discrimination.

At Sears, there are two routes by which a person can advance to a management level position. First, Sears promotes a substantial proportion of its retail management personnel from its retail sales staff. The second route to advancement is a formal management training program known as the Retail Management Development Program. Since each of these avenues to a management level position is important to this case, the Court will briefly describe each.

Most persons who advance to a retail management position are promoted from Sears' retail sales staff. Such promotions are based in part on the individual's performance as a retail salesperson. In addition, the individual is expected to take certain courses from the Sears Extension Institute. These courses are offered to all Sears' employees who take the initiative to enroll. The popularity of this route to a management position is reflected in the fact that more than seventy per cent of the management personnel were promoted from the sales staff [Tr. 36–37, 96, 429–40].

Unlike the informal route to a management position, RMDP, the formal management training program, consists of a more structured training process. During the initial phase of the program, the trainee participates in a nine-month job rotation. This part of the program is designed to give the trainee contact with each department in a retail store. Upon completion of this phase of the program, the trainee is then placed in the position of Department Manager or Assistant Division Manager. These are not salaried positions. The trainee works in these types of positions for approximately three years. At that point, if

2. As indicated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff may establish a prima facie case of "disparate treatment" by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
(Footnote of the court).

the trainee continues to make appropriate progress, he or she is promoted to a salaried position. This promotion completes the training program.

It is important to note that, throughout the RMDP, the trainee is expected to do many menial, nonglamorous jobs. The purpose of this last aspect of the RMDP is to give the prospective manager a better understanding of the duties of those working under him [Tr. 6, 83, 286, 297–98].

In order to become a participant in RMDP, an applicant must successfully complete a highly competitive, two-step screening process.

The first step of the screening process is the initial interview. Sears conducts these interviews either at the applicant's college campus or in a local Sears' store. They generally last thirty minutes. The initial interview is a crucial part of the process since an applicant who fails to receive a favorable recommendation after the interview is generally not given further consideration for the program. Applicants who receive favorable recommendations are then reviewed by Sears' regional office. From this pool of applicants, a select number are then chosen to take a battery of tests. The applicants' test scores and performance in the interview are then reviewed, and a very select number of applicants are offered positions in RMDP [Tr. 10, 14–15, 92–94, 133, 282–84; Ex. # 5].

The qualifications for a position in RMDP have never been reduced to writing. However, the record indicates that a college degree is a prerequisite to such employment. The applicant also has to be willing to relocate. Finally, Sears is aggressively recruiting minority applicants for positions in RMDP [3] [Tr. 21, 23].

Aside from these objective criteria, an applicant is expected to display a variety of subjective characteristics. Sears is looking for aggressive, energetic people with above average intelligence and some work experience related to retail sales. During the initial interview, an applicant is expected to develop a good rapport with the interviewer. In addition, the interviewer evaluates the applicant's preparation for the interview. It is expected that the applicant would have familiarized himself with Sears and RMDP before the interview. It is also necessary that the applicant be the type of person who can get along with his peers in a competitive environment. Sears is looking for people who would enjoy selling and who would not be uncomfortable working nights. Finally, the applicant should display an eagerness to do what is necessary to succeed as a manager.

It is important to note that the applicant must display these personal characteristics without prompting from the interviewer. In other words, the applicant is expected to sell himself to the interviewer. If these characteristics are not evident during the initial interview, the applicant will not receive a favorable recommendation [Tr. 21–23, 84–85, 283–84].

These subjective criteria are not dissimilar from some of the characteristics that Sears looks for in its retail sales staff. Although the criteria are somewhat similar, the standard by which the characteristics are assessed is stricter for RMDP applicants than for sales staff applicants [Tr. 43–48].

The plaintiff is a twenty-seven year old black male. In May, 1975, he graduated from Northern Arizona University with a Bachelor of Science degree in Sociology [Tr. 210]. At graduation, his grade average was a "B +" [Tr. 212].

Prior to receiving his college degree, the plaintiff had a variety of work experiences [Tr. 209–12]. The most significant of these work experiences occurred during the summers following his sophomore and junior years of college.

In the summer of 1973, the plaintiff was supervisor for the Neighborhood Youth Corps. The plaintiff was assigned to the Metro Area Transit Authority, and was re-

**3.** Sears has had some success in recruiting minorities for RMDP. This is reflected by the high percentage of blacks hired for RMDP during the time period from 1973 to 1979 [Ex. # 4].

sponsible for supervising the work activities of twenty youth corps workers assigned to the transit authority. Primarily, this job required the plaintiff to transport the youth workers to their various job assignments throughout the Omaha area [Tr. 211–12]. The plaintiff's other significant work experience was at Capehart Recreation Center. This job entailed organizing recreational activities for persons of all ages [Tr. 212, 323–24].

Immediately after his college graduation, the plaintiff contacted the Omaha Urban League about employment opportunities. At the Urban League, the plaintiff participated in a course on Sears' employment needs [Tr. 318–20]. The plaintiff was also interviewed by Jessie Douglas, an Urban League representative, who told the plaintiff that the defendant was actively recruiting minorities for its management training program. During this interview, Ms. Douglas gave the plaintiff a referral to Sears for an interview for a management training position [Tr. 213–14, 320–21].

On June 9, 1975, the plaintiff applied for a management training position at Sears. He was interviewed on that day by Robert Schroeder, the personnel manager for the defendant's stores in the Omaha metropolitan area. During the interview, Schroeder explained the RMDP to the plaintiff. Schroeder told the plaintiff that he would hear from Sears' regional office within ten days if his application was being considered further. They also discussed the plaintiff's prior work experience. The entire interview took less than a half hour [Tr. 12–17; Ex. # 2].

An Interview Guide and Summary Sheet was completed by Schroeder on his interview with the plaintiff. This summary sheet is a standard form used by Sears' interviewers when interviewing applicants for all types of positions.[4] The top half of this form was filled out during the course of the plaintiff's first interview with Schroeder [Tr. 17–19; Ex. # 3].

The remainder of this Interview Guide and Summary Sheet was completed shortly after the interview. In space for grading personal characteristics,[5] Schroeder gave the plaintiff an above average grade on all characteristics. Schroeder's testimony explains that this grading meant that the plaintiff was an above average applicant for a retail sales position. It was not meant to indicate that the plaintiff was an above average RMDP applicant. At the time this portion of the form was completed, Schroeder was nearly certain that the plaintiff would not be given a favorable recommendation for a position in RMDP [Tr. 18–19, 33, 42–43, 80; Ex. # 3].

With respect to plaintiff's qualifications for RMDP, Schroeder was of the opinion that the plaintiff had satisfied the objective criteria for the position. Schroeder, however, graded the plaintiff as being average or below on the subjective criteria. This assessment of the plaintiff was never reduced to writing.

Schroeder's testimony specifies the areas in which he felt that the plaintiff was deficient. The plaintiff failed to display the intellectual ability necessary for RMDP. The plaintiff lacked any related retail selling experience. During the interview, the plaintiff failed to keep good eye contact with the interviewer, and was unable to develop a congenial atmosphere during the interview. In other words, he was unable to establish a good rapport with the interviewer. The plaintiff also gave an unfavorable impression because he was not knowledgeable about Sears or RMDP. Finally, Schroeder felt that the plaintiff failed to

4. This form is different from the Interview Guide and Summary Sheets used for RMDP on-campus interviews. The evidence does not indicate why Schroeder used the general summary sheet for his interview with the plaintiff, rather than the special RMDP form. However it is clear that Sears does not require that the special form be used for in-store interviews of

RMDP applicants [Tr. 19–20, 78, 292–93; Ex. # 4].

5. The following personal characteristics were listed on the form: appearance/neatness; health/vitality; voice/speech; friendliness/social skill; eagerness/desire for job; maturity; and aggressiveness.

show that he sincerely wanted to be a part of RMDP. The plaintiff gave Schroeder the feeling that a college degree was the ticket to success. He did not convince Schroeder that he was willing to do the nonglamorous tasks necessary for success. His sincerity was further questioned because he failed to do anything to prepare for the interview. Based on all of these observations, Schroeder concluded that the plaintiff could not be recommended for RMDP [Tr. 23–33, 86–91].

The plaintiff has the burden of proving that the defendant's refusal to place him in RMDP was racially motivated. Although it is a close question, the Court is of the opinion that the plaintiff has established a prima facie case of race discrimination. See Young v. Farmland Foods, Inc., CV 76–0–495, Slip op. at 4 (D.Neb. June 7, 1979). However, for the reasons discussed below, the Court finds that the defendant has amply rebutted any inference of discrimination created by the plaintiff's prima facie showing.

The testimony of Schroeder clearly rebuts any inference of discrimination, and affirmatively establishes that Sears' failure to hire the plaintiff was the result of his relative lack of qualifications. The testimony explains in detail the various ways in which the plaintiff failed to satisfy the strict qualifications of RMDP. The Court does not believe that Schroeder's explanation is merely a pretext for covert racial discrimination. In fact, the plaintiff's subsequent performance as a retail salesman [6] and his demeanor on the stand verify Schroeder's assessment that the plaintiff was not RMDP material.

The plaintiff argues that the statistical evidence on the racial makeup of Sears' work force shows that Schroeder's decision was racially motivated. This evidence reveals that in 1975, the per cent of black managerial personnel at the Sears Omaha stores (3.6) was less than the per cent of blacks employed at Sears (8.0) and the per cent of blacks in the labor force (6.4) [Ex. # 9].

Although statistical evidence may be used to show that an employer's proffered nondiscriminatory reason for refusing to hire a minority is a pretext, the plaintiff's evidence is insufficient to establish that Schroeder's explanation of his actions is a pretext. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). The statistical evidence offered by the plaintiff has little probative value because the comparison between per cent of black managers and per cent of other blacks fails to take into account the special qualifications of managerial jobs.

In Teamsters, the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was highly probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

Hazelwood School District v. United States, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977). See 2 Larson on Employment Discrimination § 50.23(b) (1980). More importantly statistics alone are not "in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to [hire]." (emphasis supplied). McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 805 n.19, 93 S.Ct. at 1826 n.19. In the instant case, Schroeder's reasons for not hiring the plaintiff are so credible that the plaintiff's statistical evidence is not sufficient to persuade the

---

**6.** The plaintiff's performance as a salesman shows that he was often unwilling to do the nonglamorous or menial jobs associated with sales. This performance suggests he would also have been unwilling to do the nonglamorous tasks required of RMDP trainees. The plaintiff's experiences as a salesman are discussed in more detail below.

Court that Schroeder's decision was based on improper criteria. In other words, the plaintiff has failed to prove by a preponderance of the evidence that Schroeder's actions were racially motivated.[7]

### III.

The second act of alleged discrimination involved the plaintiff's desire to receive management training while he was working as a retail salesman.

When the plaintiff did not hear from Sears about RMDP, he called Schroeder and arranged for a second interview. This interview took place approximately two weeks after the plaintiff's initial meeting with Schroeder. During this second interview, the plaintiff was hired as a commission salesman in the Men's Suit Department [Tr. 34–35].

At the second interview, Schroeder told the plaintiff that RMDP was not the only way a person could reach a management level position at Sears. The plaintiff learned that Sears did promote sales personnel to management level positions, even though they had not participated in RMDP. Schroeder explained to the plaintiff that such advancement was based in part on whether the individual had taken training courses through the Sears Extension Institute [SEI]. These courses were available to all Sears sales personnel. Specifically, the plaintiff was informed that he should take the SEI courses on operating a Sears' division and on managing a division. Although Schroeder did explain the alternate route to a management position, he did not tell the plaintiff how long it would take him to be promoted to a management position[8] [Tr. 34–37, 96, 119–20].

Despite Schroeder's advice, the plaintiff never enrolled in any SEI courses while he was employed at Sears. These courses were publicized by handouts and bulletins posted throughout the store. In fact, the plaintiff never again discussed management training with Schroeder after the second interview [Tr. 96, 126].

■ The preceding discussion shows that the plaintiff's failure to receive any training while employed at Sears was a direct result of his own inaction. In such a situation, Sears cannot be found liable for discriminating against the plaintiff unless the plaintiff proved that similarly situated whites were given training without requesting it. The evidence, however, clearly shows that all employees were expected to take the initiative in asking for training. The Court therefore finds that Sears did not treat the plaintiff less favorably than other employees because of his race.

### IV.

The plaintiff also alleges that he was required to perform a number of tasks not assigned to other salesmen. According to the plaintiff's testimony, Tony Murante, Men's Suit Department manager, told the plaintiff to wash windows, empty trash cans, dust ledges, and bring out racks of clothes. Since the white sales staff allegedly were not required to do these tasks, the plaintiff contends that the assignment of these tasks amounted to employment discrimination [Tr. 227–30, 350–55, 374–77].

■ Notwithstanding the plaintiff's testimony, the Court is of the opinion that the plaintiff was not assigned tasks not given to other employees. Murante specifically denies treating the plaintiff differently

---

7. Both parties have offered into evidence copies of Interview Summary Sheets completed on other RMDP applicants. The probative value of these exhibits is severely limited by the fact that these summary sheets do not indicate the race of the applicants. A comparison of Schroeder's evaluation of the plaintiff as an RMDP applicant with scores of other RMDP applicants is of little value since no inference of discrimination arises without knowing the race of the other RMDP applicants.

8. The plaintiff's recollection of this second interview is different in some respects from Schroeder's. The Court, however, is of the opinion that the plaintiff's testimony is not credible, since the plaintiff's veracity has been impeached on a number of occasions throughout this trial [Tr. 326–333, 344–49, 385–90, 398–400, 418–422, 518–20, –22–25].

than his other employees. This testimony is corroborated by Isadore Lewis, the other full time employee in the suit department. Lewis has testified that the plaintiff had the same duties as the other salesmen. The evidence indicates that all salesmen were required to do certain non-sales duties. Included among these duties were: cleaning glass on cases and racks, brushing suits, dusting ledges, and bringing out racks of clothes. Since these tasks were assigned to the white sales personnel, the plaintiff cannot contend that requiring him to perform these tasks amounted to race discrimination [Tr. 528–30, 535, 542–44, 548–50; Ex. # 43].

It is true that washing windows and emptying trash cans were not considered duties of salesmen in Sears' men's suit department. The plaintiff has testified that both Murante and Lewis observed him performing these tasks. Murante, however, denies ever asking the plaintiff to do these tasks, and testified that he never saw the plaintiff doing them. In addition, Lewis testified that he never saw the plaintiff washing windows or emptying trash cans. Based on this evidence,[9] the Court finds that the plaintiff was not in fact required to empty trash cans or wash windows. The plaintiff therefore cannot prevail on his claim that the defendant discriminated against him by assigning him inappropriate tasks.

## V.

■ The plaintiff alleges that Murante often referred to him by the racially derogatory term "nigger." He also claims that Lou Billmeyer, a supervisor at Sears, and other Sears' employees frequently asked the plaintiff, "Where's your shuffle?", a question which the plaintiff felt was racially derogatory. For the reasons discussed below, the Court finds that the plaintiff has failed to prove that he was a victim of racially motivated harassment sufficient to establish a claim of employment discrimination.

The plaintiff has testified that, on several occasions, Murante threw suits and sales tickets, and referred to him as a "nigger." This testimony is somewhat corroborated by the testimony of Mr. Nathaniel King and Mr. James Hill. The plaintiff's testimony also indicates that Billmeyer, Murante, Schroeder, and Robert Markt, Sears' operating manager, asked the plaintiff, "Where's your shuffle?" The plaintiff has stated that he felt that this statement had racially derogatory overtones [Tr. 158–162, 230–34, 255–57, 299–301].

In support of his position, the plaintiff offered the testimony of Mr. King. In this testimony, King described a conversation during which he overheard Schroeder and Markt referring to the plaintiff as a "nigger." The defendant has, however, offered testimony and documentary evidence proving that it was physically impossible for King to have overheard the conversation in the manner he describes. This evidence seriously impeaches the credibility of this witness. The Court therefore finds that King's testimony, in general, is of little probative value [Tr. 164–68, 182, 192–93, 471–81, 499, 501; Exs. # 47, # 61].

The plaintiff has also offered the testimony of a Mr. James Hill. This testimony indicates that Mr. Hill was present when a man fitting Mr. Murante's description called the plaintiff "nigger." Mr. Hill, however, also testified that the plaintiff later told Hill that the incident was no "big deal." It should also be noted that, during his deposition, the plaintiff failed to list Hill among those who had witnessed the defendant's employees calling him a "nigger." [Tr. 199–208, 343–349].

In response to this evidence, the defendant has offered the testimony of the various persons who allegedly harassed the plaintiff, and who were present when these incidents allegedly occurred. Murante denies ever having used racially derogatory terms

---

**9.** Nathaniel King, a former Sears' employee, testified that he observed the plaintiff washing windows [Tr. 163–64, 173–75]. The Court, however, does not find King's testimony credi-ble. Mr. King's veracity was seriously impeached during the trial [Tr. 164–68, 182, 192–93, 196–97, 474–81, 497, 501; Exs. # 47, # 61].

with reference to the plaintiff or any other black employee. He further denies that he ever threw clothes or sales tickets at the plaintiff. Murante's testimony is supported by Isadore Lewis, who was present during at least one of the incidents described by the plaintiff. Lewis testified that he never saw Murante treat the plaintiff differently than white employees, and that he never heard Murante call the plaintiff a "nigger." Moreover, both Schroeder and Markt testified that they never referred to the plaintiff by a racially derogatory term. With respect to the conversation which King overheard, both witnesses deny that the conversation ever occurred [Tr. 131–32, 480–81, 527–28, 544–47].

When faced with directly contradicting evidence such as has been offered here, the Court must carefully consider the credibility of the various witnesses. As has been discussed above, the Court is of the opinion that the credibility of the plaintiff's evidence is suspect. In light of this fact and the defendant's evidence in rebuttal, the Court is of the opinion that the plaintiff has failed to prove by a preponderance of the evidence that the incidents of racial harassment described by the plaintiff did in fact occur.

## VI.

The plaintiff contends that the Sears' disciplinary procedure was used to harass him.

Employee discipline at Sears may be divided into three parts. The first level is informal discussions between the employee and his immediate supervisor. If these discussions fail to remedy the situation, the employee is given a "deficiency interview." This second level of discipline is much more formal than the first. The employee is specifically told how his performance is lacking, and what the consequences will be if improvements are not made. After the deficiency interview is held, the matters raised in the interview are reduced to a writing signed by the employee. The final level of discipline is termination. Although some infractions may justify immediate termination, it appears that, as a rule, Sears attempts to give an employee a second chance whenever it is justified. In certain cases, a person can be terminated without first receiving a deficiency interview [Tr. 58–59, 135, 441–44, 462–63].

On several occasions, the plaintiff's job performance was the subject of informal disciplinary discussions. On August 9, 1975, Markt had an informal discussion with the plaintiff about his failure to meet the sales quota. He was warned that if he failed to improve his performance he would be terminated. Markt observed that the plaintiff appeared to be "very tight" during the interview. The plaintiff told Markt that he was no fool and that he would call the E.E.O.C. [Tr. 465–66; Ex. # 38].

The evidence reveals that the plaintiff was below his sales quota for the months of July, August and September, 1975. Once his sales performance improved, the plaintiff was not subjected to further disciplinary action on that issue. During the six months of plaintiff's employment at Sears, Isadore Lewis, plaintiff's co-worker, failed to make his sales quota on three occasions. The evidence, however, does not show whether Lewis was subjected to informal disciplinary discussions similar to the plaintiff's discussion with Markt [Tr. 502; Ex. # 13].

On September 25, 1975, Markt met again with the plaintiff. The subject of this meeting concerned the plaintiff's failure to follow proper refund procedure. The plaintiff was told that he should not refund money to a customer without a sales ticket. Markt instructed the plaintiff to refer such customers to Murante or customer service. This interview was apparently precipitated by an earlier discussion between the plaintiff and Murante about refunds [Tr. 234–39, 467–70; Ex. # 37].

On October 21, 1975, Schroeder conducted a formal deficiency interview with the plaintiff. This interview was the first time that the plaintiff had come to Schroeder's attention since he had interviewed the plaintiff in June. The topics of this interview were the plaintiff's reluctance to do non-sale duties, and the plaintiff's mis-

handling of merchandise refunds. During the interview, Schroeder stressed the importance of general housekeeping to Sears' business. He told the plaintiff that he must begin to do these housekeeping tasks without having to be asked. In addition to discussing housekeeping tasks, Schroeder told the plaintiff that he must constantly patrol the department looking for shoplifters or unattended customers. With respect to merchandise returns, the plaintiff was directed not to make any exchanges without receipts and not to make exchanges without authorization.

After the interview was conducted, the plaintiff signed a form summarizing the matters which had been discussed. The summary stated that the plaintiff knew that if he failed to make improvement, he would be terminated. The plaintiff signed the sheet without objecting to its contents. In December, Schroeder advised the plaintiff that his work had improved and that Schroeder would continue to monitor the plaintiff's performance [Tr. 54–57, 120–26; Exs. # 14, # 35].

██ The preceding discussion shows that the plaintiff was the subject of a number of disciplinary meetings. This showing alone, however, is not sufficient to establish a case of employment discrimination. In order to prevail, the plaintiff must prove by a preponderance of the evidence that these disciplinary meetings were racially motivated harassment. Such a showing has not been made here.

The evidence shows that, during the time period when Markt questioned the plaintiff about sales quotas, the plaintiff was not in fact meeting his sales quotas. The record thus shows that the reason for Markt's conferences with the plaintiff was the plaintiff's failure to properly perform his job. The plaintiff's evidence fails to show that race was a factor in Markt's decision to discipline the plaintiff. The fact that Lewis also failed to make quota on occasion is of little probative value, since the evidence does not show that Lewis received treatment different from the plaintiff.

With respect to the disciplinary action founded on the plaintiff's reluctance to perform his non-sale duties, the Court is of the opinion that the record as a whole establishes the plaintiff's unwillingness to perform the tasks assigned to all sales personnel. Based on this evidence, the only reasonable conclusion is that the plaintiff's failure to do his job was the reason why he was disciplined. Nothing in the record suggests that the plaintiff's race was a motivating factor in the actions of the defendant's employees. The plaintiff's evidence fails to create an inference of discrimination, since he has failed to show that similarly situated white employees were not subjected to the same type of discipline. The Court therefore finds that the discipline directed at the plaintiff was the result of his inadequate job performance.

The plaintiff's final claim of harassment involves the disciplinary action taken because the plaintiff mishandled merchandise returns. Essentially, the plaintiff contends that this disciplinary action was harassment because he had in fact followed the procedure outlined by his supervisors. The Court does not believe that the plaintiff was disciplined, even though he had properly handled the merchandise returns. This conclusion is based on the fact that, after Schroeder's deficiency interview, the plaintiff's performance improved, and he was not again subjected to disciplinary action. In fact, a period of two months passed, during which the plaintiff was not subject to any disciplinary action. If the real motive for the discipline had been the plaintiff's race, the disciplinary action would have continued despite the plaintiff's improvement. The Court therefore finds that the plaintiff had been disciplined because of his failure to make proper returns, and not because of his skin color.

### VII.

The plaintiff was terminated by Markt following an incident which was observed in part by Murante and Lewis. The plaintiff contends that his termination was the result of racial discrimination. The evidence,

however, reveals that the termination was due to the plaintiff's insubordination and disruptive conduct.

On January 24, 1976, the plaintiff was scheduled to begin work at 12:00 o'clock noon. The plaintiff was first observed in the Men's Suit Department by Murante, who was having lunch in the store coffee shop. Murante later noticed that the plaintiff had obtained a chair from the other side of the department, and placed it in the store display window. The plaintiff proceeded to sit in the chair and to gaze out the window. At about the same time, Isadore Lewis saw the plaintiff in the window. He asked the plaintiff whether he was sick. The plaintiff, after hesitation of a moment or two, said, "It is beautiful outside; look at the sunbeams." Shortly after this exchange, Lewis saw Murante approach the plaintiff. Although Lewis could not hear the conversation, Murante has testified that he asked the plaintiff whether he intended to come back to work. Since he received no response to his question Murante then went to get Markt [Tr. 530–32, 551–54].

When Markt arrived in the Men's Suit Department, the plaintiff was still sitting in the display window, gazing out the window. Markt approached the plaintiff and asked him what he was doing. The plaintiff's response was, "What does it look like I am doing?" Markt then asked the plaintiff to go to his office and discuss the matter. The plaintiff responded by walking to the front of the department near a main aisle. He then told Markt that he refused to go anywhere with Markt. Markt then asked the plaintiff to go back to the stockroom and discuss the matter. The plaintiff again refused and told Markt he could talk to the man downtown. It was at this point that Markt told the plaintiff he had been released [Tr. 449–453].

During this exchange between Markt and the plaintiff, a number of customers stopped momentarily to observe the conversation which occurred near one of the store's entrances. The time period during which the incident occurred was one of the store's busiest, and the, Men's Suit Depart-

ment was full of customers. Markt noticed that his confrontation with the plaintiff was attracting the attention of a number of customers. He therefore decided that, since the plaintiff refused to leave the sales floor, a further scene could only be avoided by firing the plaintiff. Markt testified that his decision to terminate the plaintiff was based solely on the plaintiff's behavior on that day. The entire incident involving Markt lasted approximately five minutes [Tr. 453–58, 481–84, 490–95, 498, 531–32, 555–562; Ex. # 62].

Based on the facts outlined above, the Court is of the opinion that Markt's reason for discharging the plaintiff was legitimate and nondiscriminatory. The evidence shows that the plaintiff's behavior on the day of his discharge was entirely unacceptable under the circumstances. Insubordination and disruptive conduct are generally recognized as valid reasons for terminating an employee. *See Garrett v. Mobile Oil Corp.*, 531 F.2d 892, 894–96 (8th Cir. 1976); *Vaughn v. Westinghouse Elec. Corp.*, 471 F.Supp. 281, 286–87 (E.D.Ark. 1979), *aff'd*, 620 F.2d 655 (8th Cir. 1980).

Despite the circumstances surrounding the plaintiff's termination, the plaintiff contends that the termination was racially motivated because of Markt's failure to follow the termination procedures found in Sears' Personnel Manual. This contention is without merit. First, the manual clearly states that certain offenses may justify "on-the-spot" dismissals [Ex. # 52, p. 1]. Given the plaintiff's repeated refusal to talk with Markt, the Court is of the opinion that Markt's "on-the-spot" termination was not in violation of Sears' policy, even though no deficiency interview was conducted. Second, the manual provides:

When an employe's work, attitude or deportment becomes unsatisfactory, management must make a sincere effort to help the employe correct his/her faults as outlined in the section "Correction of Employe Deficiencies". If all efforts to correct the employe deficiencies are unsuccessful, the employe is to be released.

[Ex. # 52, p. 11]. The Court finds that Markt complied with this provision by making sincere efforts to correct the plaintiff's behavior. These efforts were unsuccessful because of the plaintiff's adamant refusal to talk with Markt. Since Markt's efforts failed, it would appear that he was justified, under Sears' rules, in releasing the plaintiff. Finally, the plaintiff contends that Markt's discriminatory motive is evidenced by Markt's failure to obtain the unit manager's approval prior to terminating the plaintiff. Such approval is required by the Sears' Personnel Manual. The Court, however, cannot perceive any discriminatory motive in Markt's actions, since the unit manager was not in the store that day and the plaintiff's behavior required immediate action. Although the manual was not followed to the letter, this alone is not sufficient to prove that the termination was based on a discriminatory motive. The issue in this case is not whether Markt's decision was justified by sound business practice, but, rather, whether he discriminated against the plaintiff. *See Loeb v. Textron*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979); *Lieberman v. Gant*, 474 F.Supp. 848, 865 (D.Conn.1979). Based on the circumstances of this case, the Court finds that Markt's failure to follow this particular part of the personnel manual is not evidence of discriminatory intent.

The plaintiff further contends that the pretextual nature of Markt's explanation for the plaintiff's termination is shown in the defendant's treatment of its white employees. The plaintiff argues that the defendant would not have terminated a white employee in the plaintiff's situation. In support of this contention, the plaintiff has offered into evidence the disciplinary action taken by Sears against two of its white employees, L. J. Gaughn and Terry White [Exs. # 15, # 17]. Each of these employees received deficiency interviews for infractions justifying termination, but neither was terminated. Each was given a chance to correct this deficiency.

 Sears' decision not to terminate these white employees does not prove that the disciplinary standard for whites was more lenient than the standard for blacks. The infractions committed by these white employees were not comparable to the plaintiff's misconduct. These white employees were not guilty of refusing to follow the directions of a supervisor and of causing a scene in front of a store full of customers. In addition, one of these white employees, Terry White, had nine years of service with Sears. Length of service is a legitimate consideration in determining whether to terminate an employee. Finally, the Court notes that Sears had a general policy of giving an employee a second chance when the circumstances justified a second chance. The record reveals that black employees were given second chances despite the fact that they had committed infractions warranting termination [Tr. 194. Nathaniel King was a black employee of Sears]. The Court finds that the plaintiff's adamant refusal to talk with Markt makes his infraction different from Gaughn and White. The circumstances surrounding the plaintiff's termination did not justify giving the plaintiff another chance.

 The plaintiff also attempts to prove pretext by showing that the percentage of blacks terminated "for cause" is higher than the percentage of blacks in the Sears work force. This comparison is of little probative value because of the small number of employees terminated for cause. In 1975, a total of fourteen employees were terminated for cause. Of these employees, nine were white and five were black. Whatever the statistical disparity between the percentage of black terminations and the percentage of black employees working at Sears, it is insufficient to convince this Court that Markt's termination of the plaintiff was racially motivated.